May I proceed? Good morning, Your Honors. My name is Lisa Rossano, and I am the attorney on behalf of the relators, certain of whom are in the courtroom. I'd like to reserve five minutes for rebuttal. By the mandatory non-discretionary terms of 42 U.S.C. 8287A2B, all energy savings performance contracts must pay for themselves through cost savings. Furthermore, the contractor must guarantee that the project will result in savings which comply with that mandatory requirement. The critical language at the heart of the statute, which Honeywell never addressed and the District Court never addressed, is, quote, aggregate annual payments by an agency to both utility and energy savings performance contractors may not exceed the amount that the agency would have paid for utilities without an energy savings performance contract. The contract shall provide for a guarantee of savings to the agency. The key word here is aggregate. The District Court omitted the crucial part of the statute from its analysis, and what the Army would pay for both heat and electricity must be considered. Rosano, as I get your case here, it's not one for noncompliance with statutory terms, correct? We're saying they did not comply with the statutory terms. But that's a predicate for saying that Honeywell lied with the intent to lie, because this is a qui tam case, right? This is a qui tam case. So, therefore, let's go to the real issue in this case, whether the disclosures by Honeywell in its estimates actually told the government agency what the costs would be and didn't misrepresent the facts objectively and didn't do so, obviously, with the intent to deceive. That's what I'd like to hear from you. Well, Your Honor, with all due respect, the court should evaluate first, though, however, whether there is a false statement under Oliver v. Parsons. And that's an objective analysis. Not a claim that doesn't follow the statutory requirements, a false claim. Did the paperwork between Honeywell and the government misrepresent the savings? It absolutely did. Okay, so Honeywell explained how it calculated the savings, right, and never purported to include any electricity costs therein. I think that's a testimony of Margaret Simmons, Army Counsel, that the information used in the calculations was available for everyone to see and no one tried to hide it. It was open and above board. Honeywell's presentation dated February 29, 2000, highlighting, quote, net electric cost increase of $891,437 due to closure of CHPP and proposal to include that increase is estimated, quote, total annual baseline energy costs. So they said how they were calculating it and that Honeywell's statement of the energy baseline and that expected savings, how was it objectively false that the project would reduce Fort Richardson's heating costs? Because the first thing that Honeywell must do in order to comply with the statute is promise, guarantee, must have the aggregate annual payments for both utilities and the contractor payments are within the statutory limitation. And Honeywell's February PowerPoint makes no such representations as to what the ultimate outcome was, what AAA found, the Army Audit Agency, confirmed, which is that the project would never pay for itself. Honeywell never told the government that. It's not in that February PowerPoint. It's not in anything that Honeywell ever gave the government. It never told them. And it's obligated to do that. It's required to do that. It never told them it would never pay for itself. But what if they guarantee and they turn out they're mistaken? It's one thing to have a mistake and bad math, but the evidence in the record was ample as to Honeywell's actual knowledge that the guarantee was false, that the project would never pay for itself at the outset. But the first thing that I think that the court should, however, and this clarifies really what the errors were in the district court's analysis, is whether there was an objective false statement. And Oliver v. Parsons dictates that in order to make that determination, where the case involves a nondiscretionary legal requirement, the court must first determine whether the representation was accurate in light of applicable law. And that is not in dispute. The AAA, the Army Audit Agency, found that the energy savings guarantee was false, did not comply with the statutory limitation. And that was, in fact, the thing that Honeywell conceded that fact in order to get Mod 2, that the baseline, the manipulations, the hidden violations of law, that was what was implied, what was understood. Because if you think about it, Mod 2 was just a corrective measure. Honeywell had to basically agree that the baseline that is guaranteed was false in order to enter into it. And here, at Honeywell's urging, the district court applied the wrong standard and applied basically common law principles of falsity rather than the False Claims Act definition of a false statement, which is a false statement of fact, and that it restricted the court's scope of examination. And Hendo says that falsity is not merely a false statement of fact but includes a false statement or fraudulent course of conduct. And Congress intended the False Claims Act to embrace not only affirmative factual misrepresentations but hidden violations of law. Hendo, legislative history, and the Supreme Court's recent Escobar decision are all in accord. Materiality is the next thing that the court should consider. Once you've established that there is a false statement, which there is, the AAA established it, and Honeywell's 30B6 witness, Richard Rogan, conceded through his own calculations using Honeywell's own data that the project would not pay for itself. And Suzanne Wunsch, Honeywell's team leader, admitted under oath that the project would not pay for itself. Honeywell knew the project would not pay for itself, and she believed that the government did not understand this fact. So materiality under the False Claims Act is defined as having a natural tendency to influence or be capable of influencing the payment or receipt of money or property. Honeywell's false promise and guarantee was necessarily material because had the government known that the project would never pay for itself and had it known the truth, it would never have, nor could it have, awarded the two task orders. And Escobar confirms this by citing to Marcus v. Hess as an example of materiality. And this was not a minor regulatory violation, and it was not an inconsequential breach of contract. This statutory requirement that the project pay for itself is the heart, the critical part of the government's award of the contract. Well, on the materiality, if you look at Universal Health Services v. United States, ex-relator Escobar, if you look at Escobar, the Supreme Court said that if the government pays a particular claim in full, despite its actual knowledge that certain requirements were violated, that's very strong evidence that those requirements are not material. And in this case, the government began paying Honeywell's claims in 2003 and continued up to at least 2008, despite being aware of the relator's fraud allegations in 2002, the results of its own audit in 2003, and the problems with the infiltration rates since 2004. Isn't that very strong indication that the requirements were not material to the government? Absolutely not, Your Honor. Sorry to interrupt. It is absolutely not, with all due respect. Mod 2 was a desperate measure. The government didn't even know at the time that it entered into Mod 2 that Honeywell had always known that the project would not pay for itself. It didn't have that critical information at the start. And I'm talking Mod 2 was entered into in 2003. Honeywell had never told the government in the course of those negotiations in any of the investigation. How is that relative to the audit, where the audit pretty much says all this stuff? Well, the audit basically says the guarantee was false, but nobody knew that Honeywell had committed a violation of the false claims, that Honeywell always knew and that the government had been forced into a contract that never would have worked. So Mod 2, and if you look at the context of Mod 2, the government not only didn't know that this project was a total failure from the outset, but they were looking at an unfinished project, contractor on base, nothing finished, and winter coming on, and they testified, those government officials, and I think we've cited in our brief thoroughly, that they didn't have very many options. They felt that they had to do the lesser of the two evils, one of which was the $50 million termination clause, and the other of which was scramble around and try to find someone else, try to finish this project. And it's not uncommon, it's not uncommon for a contractor to have to, for the government, to have to continue on with the contract, because it's in the interest of the public safety. And the cases are there as to the government having to do that, because, for instance... This got remanded one time, right? Got twice. Twice, okay. And so what did your last complaint look like that was different from the other complaints? We alleged, more specifically, the fraud, the acts of hidden violations of law, the way in which Honeywell did it, all of the admissions that Honeywell had made, the manners in which they had inflated their energy cost baseline in order to manipulate the project to make it seem that it would pay for itself. And back to the Mod 2, Your Honor. Escobar confirms, and we did add an additional authority to the court, but the court, it's not a litmus test, the fact that the court continues on a project. When the government has to continue on, and when it's conducting investigations, that, in fact, shows immateriality, when it takes it seriously enough to say, we're going to have the Army Audit Agency get involved, and when the Army Audit Agency's findings prompt a modification of the contract, that shows that it mattered. It would be a different situation if the government just ignored the relator's allegations and then just went on paying. The remands, what state was the case in, what was the panel, and what were the dates of the remands? The first remand was, I believe, in 2011. And I cannot recall the names of the judges. But in the second remand, that was 12B6, I believe, on the pleadings. And then the second one was when Honeywell renewed its Rule 9B motion on the pleadings. And the panel members included Judge Wardlaw. And, Judge, I think, Judge Bea, I don't remember if you were on the panel. You were on one of our panels, actually. And I cannot remember the other judge, but Judge Wardlaw. Oh, Morgan Christian, I believe, was on the second panel. Down to about three minutes, Your Honor. So, Your Honors, the most important part here, though, is scienter. And this is where I think the Court should focus. There is actual knowledge in the record that Honeywell knew what it was doing at the outset. And I've said that before. Its admissions through its team leader, that it always knew that the project would not pay for itself. It admitted that the government was not so informed. And she admitted that she believed that the government did not understand that the project would not pay for itself. But only when there is an absence of that actual knowledge, then do you get to the other culpable forms of scienter, the deliberate ignorance and the reckless disregard. And that is the only stage in which the Court evaluates what the government knew. Because we have actual knowledge here. We don't even have to get to that. He had rejected that. He said you had not shown any actual knowledge. And then that was improper. We're at summary judgment.  And that was improper. Sorry, Your Honor. And what the District Court went on to say is that you had to separate out the privatization from the projection. And that was fully explained to the government. That was the – you can shake your head. I'm just telling you what the District Court said, as you well know. So tell me what's wrong with that construction. Privatization was this amorphous discussion. And we've pointed out that there was never anything that was firm. There was never anything that was secure about privatization. And in any event, it was not in the government's economic interest to privatize. They had no – they were going to be basically destroying a perfectly good, well-functioning utility system. That was their intent. It wasn't their intent. The record does not actually reflect that. It reflects discussions. It reflects something that was vague, a concept. But it does not reflect an intent, a plan, committed funds, congressional – budgeted funds, appropriations for any sort of privatization. And to be honest, Your Honor, the privatization – what is privatization? The Department of Defense directive indicated that privatization is the conveyance of a working utility system to a private contractor so they can run it. Not that privatization is destroying the very thing that runs the electricity and makes the heat. You're down to about a minute. So we do have actual knowledge. There was no privatization. Do you want to save any time for rebuttal? Oh, sorry, Your Honor. Thank you, Your Honor. I was just giving – trying to help you with your time. Thank you. May it please the Court, Counsel, I am Teresa Bevilacqua from Dorsey & Whitney here on behalf of Honeywell. And I'd like to pick up and answer a few questions that the panel has already asked because it is relevant to the questions before the panel today. The two prior times this Court has heard argument on this case related to the pleadings phase of the case. First, Rule 12b-6, that appeal was taken up in 2011. The panel decided it in 2012. Judge Bay was on that panel along with Judge McEwen and I believe Hawkins. It's an H. And then the second time was on 9b grounds. Again, failure to plead fraud with particularity in the complaint. And that panel was Judge Christian and Judge Wallace. And also Wardlaw. Thank you. And what happened in that second remand is most important today. At the time, this Court said Honeywell may ultimately prevail on a motion for summary judgment based on the lack of essential elements or based on the government's knowledge.  Fast forward several years, discovery, mountains of evidence, 22 depositions, and we put the evidence in the record and the lack of evidence on the essential elements of relator's claims in front of the district court. I would also note that the district court was now a different judge. When the case was remanded a second time about halfway through the discovery period, the district court judge became Judge Gleason. So it's a different district court judge who wrote this summary judgment opinion than the prior opinions looked at at the pleading space. And that opinion is what is being appealed and what is ignored in large part by all of the arguments made by the appellants in this case. Well, she was talking about on the Scienter. Yes. And I'm looking at it looks like regarding infiltration rates in 2006. The Honeywell executive, Stephen Craig, said the reason the energy saving for the project could not be realized was because of the infiltration due to the building heating system controls and the occupants opening windows in the doors in the building. According to Craig, this was not something Honeywell could control. And the government had, in fact, agreed to perform work on these facilities to control the infiltration. Without this work, Craig stated that Honeywell project was not a viable project. Why is that not evidence of Scienter? Because of the timing and because of what Mr. Craig was discussing in 2006. So it's a two-part answer, Your Honor. First, in 2000, when the contract was being negotiated with the government, Honeywell put in proposed future infiltration rates that would be achieved once certain energy measures were put into place. When the contract is actually entered into in 2000, both Task Order 8 and Task Order 9 allocates certain things to the government to do. And I believe it's in Section 2.4.3 of the task order and the contract in Proposal Number 4. And so Honeywell, as the contractor, cannot control the physical actions of the members of the military on the base. So if it gets too hot, things that were observed in the pre-project phase were opening windows and doors in the middle of the Alaska winter to cool off the buildings. Honeywell can't control that if that happens once the project is completed because they don't control those individuals at the base. The government does. And so it's the government's responsibility to control compliance with the energy cost savings that are put into place, such as we've got new thermostats, we've got ways to distribute the heat better so it's not as uneven, making certain rooms hot, and the government is going to take on that responsibility. I think the relators argue that Craig's statement carried an implicit admission in Craig's statement that Honeywell was completely aware of the easily verifiable fact that the buildings on the base were 40-year-old, well-weathered buildings and nevertheless intentionally chose to employ infiltration rates which were significantly less than recommendations. I think that's what they're arguing, I think. That's now their argument on infiltration, and I will say this. The infiltration rate issue is a complete red herring because at the end of the day, whether or not those infiltration rates are achieved at any given point in the contract's 25-year performance goes to the heart of whether Honeywell gets paid. If Honeywell can't actually demonstrate the savings that it promised, and however they're going to be measured by the government, Honeywell does not get paid. And, in fact, that is what happened with the infiltration. And if you look at the record citations, the deposition of Earl Johnson, who was the contracting officer after MoD II was signed. Earl Johnson's deposition is in the supplemental excerpts of record starting at page 10. And it was his testimony under oath that he was aware of an infiltration issue once we get to performance on the contract. It was examined, and payments made to Honeywell were adjusted in accordance with whether or not certain future rates were achieved. If a savings was not achieved, the payment was reduced. Where savings were achieved, then the payment was made. And that's the way it's taken care of. And the other thing to note is that there is substantial evidence in the record that the contract saves energy, and the contract saves energy dollars. And that was noted both in the district court's opinion, and it's noted in the testimony of the government witnesses, including Earl Johnson, who has signed on and made the payments to Honeywell since MoD II was executed in 2003. When you say energy, you mean heat energy, not electrical energy? Correct. And the contract was modified before any payments were requested or made. And I just want to clarify that, Your Honor. And that happened on August 13, 2003. That modification was executed by the government and by Honeywell. And it was MoD II. After or before the audit? It was after the audit. The audit started at the very end of 2002 and continued through the first half of 2003. The AAA's final report was July of 2003, and the AAA is the entity that came up with what the stipulated and adjusted savings guarantee would be for the modification that the government ultimately entered. Okay. I did want to talk a little bit about the thing, the primary thing that relators contend was the alleged fraud, which was the adjustment to the baseline to reflect the fact of a closed central heat and power plant. So this is, as Your Honor was pointing out, the privatization issue. There is record evidence that indicated the military was proceeding with a privatization initiative. And you can see it in the supplemental excerpts of record in 173, and you can see it again in the supplemental excerpts of record 320 and 332. That was the stated purpose of the government at the time it was negotiating with Honeywell, was we're going to close the central heat and power plant at Fort Richardson and privatize the electricity. And Honeywell was asked to calculate what the savings would look like given those two assumptions. Those were the calculations that were made, and the fact that this adjustment was taken into account before the contract was entered. The baseline was adjusted to say the power plant is now closed because that's the assumption the government has given us. Those calculations were not false as a matter of law. This isn't a case where the government said please do one calculation and Honeywell did another, or the government said use these input variables and Honeywell used different input variables. Honeywell took the information provided to it by the government, the assumptions provided to it by the government, and then showed its work at every step of the contracting process before the contract was awarded and said this is how we are calculating energy savings. And it shows it in the February 29, 2000 PowerPoint, which was jointly given by the U.S. Army Corps of Engineers and by Honeywell and by the DPW at Fort Richardson. All three of those individuals or individuals from all three of those entities participated in giving that presentation. The baseline adjustment shows up clearly in proposal number three at excerpt of record 568, proposal number four, which is excerpts of record 162 to 63 and 272 to 273. And the government even asked specific questions about the electrical baseline adjustment. So it's not something that was hidden. It's not something they didn't understand. You can see the specific question U.S. Army Corps of Engineers Tim Brown made and the response given by Honeywell at excerpts of record 851 to 853. I think the argument is that Honeywell knew that if either assumption changed, then it could not provide the guarantee. Do you agree with that? In other words, if Honeywell knew that if they didn't shut down the plant, they didn't privatize, that this was never going to pencil out and didn't tell the government. I think as a fact, if you assume different things going into the contract, you wouldn't assume the same result. I understand that. But I think that's their claim is that Honeywell should have told the government, look, if you eliminate these two assumptions, this will never work. Well, if you actually look at the calculations provided and what Honeywell – no one had asked the question, if we assume different facts than the facts we're assuming, what happens? And so there's no evidence in the record that Honeywell knew that either because it was a question not asked. If we make different assumptions than the ones we're all agreeing to make, what will happen? That was not a question that was asked by the government or by Honeywell at the time. And there's nothing in the record that indicates it was any way false, knowingly false, actually false, deliberate disregard, or recklessness. Basically, it was just a flop. No, actually, it was a change of fact, right? And that's what the Margaret Simmons memo's detail. Margaret Simmons is the attorney for Huntsville Corps of Engineers. She signed off as the legal reviewer on the issuance of the contracts themselves at the time of the award. And then she also performed the reviews in 2003 that ultimately lead to modification number two. And Margaret Simmons' memos from April and May 2003 detail that the mistake made was the assumption that the plant would close and the Army would privatize the electricity. And that's a mistake made by the Army, not by Honeywell. And that's what was testified to by Ms. Simmons in her deposition and by Mr. Rogan as the 30B6 designee for Honeywell. It was a mistake made by the government. Honeywell agreed to modification number two because the AAA, the Corps of Engineers, and Honeywell came up with a way to make the contract work, even with the AAA's finding that you couldn't have this baseline adjustment as initially proposed. The parties got together and renegotiated a workable contract. And the determinations by the contracting officer at the time, Sharon Butler, is there was no fraud in the procurement, there was no fraud in mod two, and it is in the best interest of the government and Honeywell to come up with a contract that does work, that does save energy and save energy dollars. And that's what happened. And those facts are undisputed, and it's also undisputed that the government has only ever paid based on the modified contract as entered into in 2003. Did you have any other questions, Your Honor? I also just wanted to point out for the record that at least seven different government agencies have looked at this case, government agencies who investigate fraud and government agencies who are vested with looking at whether a false claims act exists. And every government agency that has looked at this has concluded that there is no fraud. And one of the reasons they concluded is because of what this court says in the Haygood II opinion. Honeywell did in this case what the Corps bid it to do. And it told the Corps what it was doing when it did it. And the Corps, with full knowledge, accepted that contract proposal. When it was later determined that there was a change in fact and a change in circumstances that made the electrical baseline adjustment no longer a valid adjustment, the contract was modified so that the government could save energy and energy dollars and the contractor could get paid. And that's what's happened ever since then. And specifically, I would refer the court to the FBI's determination of no fraud that exists at docket 4935 at 1 and 49-36 at 1 through 11, and the Army Criminal Investigative Command's determination of no civil or criminal false claims act violations. And that exists at supplemental excerpts of the record 337 through 338, plus all of the accompanying interview memorandum of these relators and of the contracting officer that CID looked at in 2006 to make that determination. Thank you. Thank you. Your Honors, the AAA never made a finding of fraud. And back to Honeywell-Scienter, that the claim of good faith is preposterous because Honeywell took as savings 100% of the cost for the operations and maintenance for producing both heat and electricity, an open plant, while simultaneously claiming the cost of commercially purchasing electricity from a closed plant. The hidden violations were, and that demonstrates Scienter as well, because when they're taking all of the credit and then saying, well, you're responsible for your purchase of electricity, then why is Honeywell taking the credit, the savings, and giving it to himself as part of this project for the purchase of electricity? And the other point is that Honeywell is basing this case, its good faith defense on what the government knew, but not what on the information that it received from its attorneys. And Honeywell's counsel assured the district court that Honeywell had no intention of basing the advice of its counsel at issue in this case, and it's not going to be the basis of any defense they ever presented in this case. But when you're determining good faith, Scienter, that it was just merely negligence and that Honeywell didn't have knowledge or should have known as a reasonable, prudent contractor that the project was not going to make it, it should have consulted with its attorneys, and the relayer should have been entitled to that discovery in order to examine the good and bad faith information, good and bad faith compliance of the law information that there is. Under an Oliver v. Parsons analysis, in light of applicable law, that is the before and after cost, the plant being closed, the cost of producing heat and electricity, the cost must be evaluated based on the existing conditions, not on some amorphous privatization event. And the other thing is Richard Rogin denied in his deposition, I'm sorry, stated in his deposition in 2015 that the base was not privatizing, and we cited that in our brief. And then they changed their position a year later, and he testified that they were privatizing. So there is a dispute of material fact here. Richard Rogin is Honeywell's 30B6 witness, and we have shifting stories as to what happened in this privatization theory. And I'm sorry, triple A never made a finding of no fraud is what I meant to say. I'm sorry. And with all of the information that Honeywell says it's told the government, and you look at its proposals, it merely posed a hypothetical if this happens. It never said that the project would not comply with the statute. And Honeywell's 30B6 witness testified. He admitted that the government was relying on Honeywell to prepare a truthful, honest energy savings guarantee. This project was meant to comply with the law as the Army knew it. They would never have signed on for it had they known it would bust the law. We'll need to wrap up. Thank you, Your Honor. Thank you. The case is argued to be submitted for decision. Thank you both for your arguments today, and we'll be in recess for 10 minutes.
judges: Thomas, Callahan, Bea